[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Facts:
The instant proceeding is a boundary line dispute between abutting property owners in a community known as Candlewood Lake Estates, located in the town of Sherman, county of Fairfield in the state of Connecticut. The plaintiff obtained his title from the estate of his deceased brother, Anthony, who died intestate on July 2, 1962. He became the record owner of the property in question, the address of which is 16 Shore Drive (lot No. 57), after paying the agreed upon installments of the purchase price, on April 6, 1959 by warranty deed, which deed was recorded on July 23, 1959 in Volume 524, page 158 of the Sherman land records. The description in the deed specifically referred to lot No. 57 on Map No. 400, which map was filed in the office of the town clerk of the town of Sherman on June 15, 1956. The defendant's indicia of title finds its origin in a warranty deed to lot No. 58, as shown and designated on the same map on July 11, 1958, which deed was recorded on September 26, 1958 in Volume 23, page 531 of the Sherman land records. The topography of Candlewood Lake Estates is mountainous and heavily wooded with large rocks, many ledges and many steep slopes. Access to accommodate motor vehicles has always been a substantial problem. Handwritten notations "Zabarovskis" and "Anderson" appear on each of the lots that they own, respectively, on the reference map. Lots No. 57 and No. 58 are steeply sloped toward Candlewood Lake and each has large rock boulders and outcroppings on it.
The reference map (map No. 400) presents the boundary lines of the two lots to be, with what might be called with poetic license, rectangular in shape. The area of both lots which lies between the "straight" lines delineating the westerly boundary of both (Lot No. 57) and the waters of Lake Candlewood is extremely irregular. A highway, subsequently designated as Shore Drive, separates the approximate easterly corner of the lot from the main parcel. In the area where Shore Drive passes through lot No. 57, it slopes steeply to the south toward lot No. 58, which lot CT Page 4764 No. 58 is bounded by and not separated by the said highway.
The plaintiff and his brother originally planned to buy lot No. 57 for a purchase price of four thousand five hundred ($4500) dollars. They decided that the plaintiff's brother would take title in his name because, at the time, his employment and earning capacity were quite substantially greater than that of the current owner and his other brother. Contemporaneously, with the initial meeting between purchaser and seller, the parties discussed the boundaries of the lot, location of the driveway and advised the grantors that the steep slopes made it impossible to gain access to the rectangular lot from the highway without an angled driveway cutting across an adjoining lot. The same access problem existed with respect to nine other waterfront lots.
To overcome this problem, the plaintiff and his brother requested the grantors modify or correct the configuration of the lot by changing the southeasterly corner of lot No. 57, to include a triangular piece of land . . . The grantors apparently acknowledged the difficulty and, indeed, attempted to "correct" that difficulty as it existed on nine lots, including lot No. 58, as aforesaid. In August of 1959, a revision of map No. 400 was filed in the office of the town clerk of the town of Sherman as map No. 448, which map carries the label "NOTE: AUGUST 1959 REVISION CONSISTS OF INCREASING SIZE OF LOTS 28, 29 AND 30, ADDING 25' BY 25' BY 33.3' TRIANGLES AT THE SOUTHEASTERLY CORNERS OF LOTS 52 THROUGH 59 AND CORRECTING FRONTAGE DIMENSION OF LOT #1."
In the interim, however, the original owners had conveyed the title to lot No. 58 to the defendant herein, by reference to map No. 400, which deed, as previously mentioned, was recorded in Volume 23, page 531 of the Sherman land records on September 26, 1958. Consequently, the corrective deed and the corrected or revised map provide no solace for the plaintiff because the grantors could not convey away land that they did not own.
The plaintiff vacationed and spent weekends on the property from 1957 through 1977. During that time, the plaintiff and his deceased brother cleared brush, trees, stones, roots and other debris from the entire parcel, including the southeast triangular parcel in dispute, throughout 1958 and into 1959. During that time, they used an iron pipe driven into the ground at the intersection of course lines . . . as the reference point for their clearing operations. Those course lines are found on a CT Page 4765 third map which was delivered to the plaintiff and his brother after the corrective map was filed, which map shows the designated subject lot on the corrective map, and which map is entitled "MAP OF PROPERTY OF EDUARD AND ANTHONY ZABAROVSKIS LOT 57 SECTION A CANDLEWOOD LAKE ESTATES SHERMAN, CONN. SCALE 1"=20' October, 1957 Certified `Substantially correct' K.W. Rogers, surveyor."
The plaintiff's home was built in 1960 and, prior to that construction, the plaintiff constructed a "driveway" from Shore Drive, so called, to the location of the house. It took the plaintiff approximately a year to clear the area of the driveway to the prospective house location and that driveway is presently located as it then was. That driveway is "located" as irregular lines, resembling what may well be shown to be fence lines on other maps, to what appear to be stairs opposite a rectangle designated as a "shed" on the plaintiff's property. This is shown on yet a fourth map, the plaintiff's exhibit[1], which is entitled "MAP PREPARED FOR EDUARD ZABAROVSKIS LOT 57 SECTION A CANDLEWOOD LAKE ESTATES SHERMAN CONNECTICUT SCALE 1"=30' November 1992 Certified `substantially correct as a class A-2 survey Richard W. Dibble, LLS #8158." This driveway, so-called, was never used as a driveway but rather as a path to and from the highway to the plaintiff's property. The area wherein the plaintiff parked his vehicles is located within the limits of Shore Drive, so-called, and not within his property and is a parcel of land much more accessible for vehicular traffic than the so-called driveway might be. The court notes from the maps before it, which have all been identified previously in this memorandum, that a very small portion of the driveway lies within the confines of the so-called triangular piece of land in the northerly or northeasterly corner of said triangle.
In 1970, the defendant built the concrete retaining wall along the northerly boundary of his property, and the southerly boundary of the Zabarovskis property which is shown as "encroaching retaining wall" on the November, 1992, Dibble survey. The encroachment consists of two legs of that wall which cross the southerly boundary of the plaintiff's property. In a matter of months after the defendant built his wall, the plaintiff built a dry stone wall along that same boundary line which remains in the same location today and runs from the edge of the defendant's "encroaching retaining wall" to a large rock boulder in which a drill hole was set . . . The plaintiff's explanation for this location was to indicate where his property CT Page 4766 ended and to ensure him that he did not cross over the southerly boundary line of his property. The aforesaid dry stone wall was built in response to the defendant's construction of his "encroaching retaining wall."
At that time, the plaintiff ran a steel wire . . . from the drill hole . . . across the defendant's "encroaching retaining wall" to the iron pipe located at the intersection as previously described. He attached blue flags along that wire, which flags he claims are visible to this date. In 1973, the plaintiff's brother, Jazeps, constructed a stone retaining wall to support the parking area for lot No. 57 with the assistance of a contractor. That wall was built along a portion of the same line as a concrete retaining wall which is reflected as a jagged line (what the court referred to as a potential fence line) in the same parking area that is used to this date. From its creation to date, the plaintiff continues to park his vehicle in that area and walk down to his house. The wall collapsed, however, in a heavy rain in 1974.
The plaintiff began to subsequently construct a retaining wall in the same general area. His first efforts were to construct a sixteen foot section buttressing the "parking area." It took him about one year to do this. Between 1974 and 1980, the plaintiff constructed the remainder of the retaining wall, continuing on from the sixteen foot section from the parking area to a point in front of his home. He built the plywood forms himself and he purchased the concrete from a contractor who poured it. That wall was completed in 1980, and the last section thereof was inscribed with the figures 1980 in the cement, approximately 25 feet from his house. He set wooden railings along the top of that wall for its entire length, which wooden railings are pressure treated, and are four by four "timbers." Since completing that retaining wall and burying its foundation, he has continued to dump leaves, boards, grass clippings and other debris at the base of the wall's lakefront side along its entire length. He has done this every year for the reason he advances of protecting the wall's foundation from freezing and to prevent a collapse as a result of any such freezing. He has planted flowers and trees in the so-called driveway, and cuts and rakes that area three to four times a year. While the so-called driveway is attractive, it provides access to his home from the parking area on foot only, because the parking area blocks that driveway and the land is too steep for a vehicle to negotiate. He claims that his purpose in building a retaining wall, filling the CT Page 4767 area between the walls and leveling the area was to provide a level, straight walkway to his home from Shore Drive, so-called, to improve the property's scenic qualities and to ultimately improve his property's value. . . . The plaintiff has paid the property taxes on the parcel to the town of Sherman and continues to do so.
In 1985, the defendant instituted a lawsuit against the plaintiff. The writ, summons and complaint were returnable to this court on December 17, 1985. In that complaint, the defendant herein claimed ownership of the triangular parcel, alleging trespass and conversion and seeking their ouster from that parcel. That litigation was dismissed for failure to prosecute with due diligence under Sec. 251 of the Practice Book on December 11, 1987. That judgment of dismissal proved to be a final judgment.
Discussion: Where title is claimed by adverse possession, the burden of proof is on the claimant. Loewenberg v. Wallace,147 Conn. 689, 699. The essential elements of adverse possession are that the owner shall be ousted from possession and kept out uninterruptedly for fifteen years under a claim of right by an open, visible and exclusive possession of the claimant without the license or consent of the owner. Stevens v. Smoker, 84 Conn. 569,574. . . .
The issue of the so-called corrective deed, executed by the Neustads, is unworthy of any further discussion. Neither party, and indeed the court, recognize that particular effort as presenting any degree of merit whatsoever. One cannot convey property to another which is unowned by the grantor. The evidence offered by the plaintiff is somewhat persuasive with respect to the "small triangular" parcel of land situated within the larger triangular piece of land in the southeasterly corner of the plaintiff's property. This court is satisfied that the plaintiff has indeed elicited clear and convincing evidence that he is the owner of that small triangular parcel of land by adverse possession. As to the remainder of the contested parcel, the court finds the plaintiff's evidence to be less than clear and convincing. The initial clearing of that land, coupled with the string of flag decorated wire and the deposit of lawn rakings and leaves "at the base of the wall" hardly satisfy the plaintiff's burden with respect to frequency, amount or definition.
The defendant claims litigation instituted by him in 1985 is CT Page 4768 an ouster within the meaning of the statute which interrupts the continuity of the plaintiff's possession. . . . There can be no doubt that the commencement of litigation is a substantial factor in the question of whether or not one claiming adverse possession has been ousted from that claim. However, the failure to prosecute such litigation, which caused it to be dismissed for lack of diligence in prosecution, and the defendant herein, never having moved to open that judgment of dismissal, is certainly as strong evidence of an abandonment of the claim as it is the assertion of an ouster. The defendant's factual predicate for his claim of ouster is hardly sufficient and, consequently, cannot be favorably entertained.
As indicated, this court is not satisfied that the plaintiff has met his burden of proof with respect to the entire triangular piece of land to which he has asserted his claim. The defendant insists that he has also failed to establish his claim to the "small triangular piece of land" by what he asserts to be a lack of specificity as to when the small wall forming a boundary of that section was completed. However, the court is satisfied that the evidence is more than sufficiently strong to convince it that the first sixteen feet thereof was begun and completed in 1974. In reference to 1980, the evidence about that date concerns the opposite end when the construction terminated and those numbers were inserted on the top of the wall.
Therefore, the court finds that the plaintiff has proven, by clear and convincing evidence, that he has openly, notoriously and continuously exercised dominion and control over and, indeed, is now the owner of a small triangular portion, lying within a larger triangular portion of land, located at the southeasterly corner of lot No. 57 . . .
Said parcel lies wholly within the driveway, so-called, as shown on the plaintiff's exhibit one. Judgment may enter, accordingly.
Moraghan, J.